R.A. GRAY & CO., Plaintiff,

v.

OREGON WASHINGTON CARPENTERS–EMPLOYERS PENSION TRUST FUND and Pension Benefit Guaranty Corporation, Defendants.

Civ. No. 81–912–RE.

United States District Court, D. Oregon.

Aug. 11, 1982.

---

Thomas M. Triplett, Mildred J. Carmack, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for plaintiff.

William B. Crow, Miller, Nash, Yerke, Wiener & Hager, David S. Paull, Bailey & Paull, Portland, Or., for defendant Oregon-Washington Carpenters-Employers Pension Trust Fund.

Henry Rose, Gen. Counsel, Baruch A. Fellner, Associate Gen. Counsel, J. Stephen Caflisch, Sp. Counsel, David F. Power, Atty., Pension Benefit Guar. Corp., Washington, D.C., for defendant Pension Benefit Guar. Corp.

## OPINION

REDDEN, District Judge:

Plaintiff R.A. Gray & Co. (Gray) brought this action to obtain a declaration that certain provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, 94 Stat. 1208 *et seq.* (September 26, 1980), 29 U.S.C.A. § 1001 *et seq.* (Supp.1981) are unconstitutional and unenforceable. Gray contends that those provisions of the MPPAA which create withdrawal liability are unconstitutional as applied to employers who withdrew from a multiemployer pension plan prior to the date of the enactment of the MPPAA. Gray also attacks the arbitration provisions of the MPPAA. Gray moves for summary judgment. The defendants, the Oregon Washington Carpenters-Employers Pension Plan Trust Fund (Trust) and the Pension Benefit Guaranty Corporation (PBGC), contend that the MPPAA is valid and enforceable and they move for summary judgment in their favor. I conclude the statute is valid. I grant defendants' motions for summary judgment and deny Gray's.

## PARTIES

The Trust is administered pursuant to the Revised Pension Plan for the Oregon Washington Carpenters-Employers Pension Trust Fund (Plan). The Plan is a multiemployer defined benefit pension plan within the meaning of the Employment Retirement Income Security Act of 1974 (ERISA), *as amended by* the MPPAA, 29 U.S.C.A. § 1301(a)(3) (Supp.1981). The Plan is a building and construction plan within the meaning of ERISA, 29 U.S.C.A. § 1383(b). The Plan is administered by the Board of Trustees (Trustees).

Gray is an employer within the meaning of Title IV of ERISA. Pursuant to succes-

**534**

sive collective bargaining agreements with the Oregon State Counsel of Carpenters (Union), Gray made contributions to the Trust to finance the pension benefits provided by the Plan.

The PBGC is a United States Corporation which was created by ERISA. It is responsible for administration and enforcement of ERISA, as amended by the MPPAA, 29 U.S.C.A. §§ 1301–1461, 1303(e)(1) (Supp. 1981).

EVENTS

In February 1980 Gray notified the Union that Gray was terminating its collective bargaining agreement with the Union. In July 1981, the Trustees notified Gray that Gray had completely withdrawn from the Plan as of June 1, 1980 and had a withdrawal liability in the amount of $201,359. The Trustees demanded payment of the withdrawal liability in accordance with a specified quarterly schedule. Gray filed this action on September 29, 1981. Gray also moved for a preliminary injunction to restrain the Trust from taking further steps to collect the withdrawal liability. I denied the motion.

In response to Gray's request that the Trustees review their determinations with regard to Gray's withdrawal liability, the Trustees issued a "Decision on Review." The Decision on Review made several findings that the Trustees had previously accurately determined: (1) the method for allocating the unfunded vested benefits to Gray, (2) the amount of the Plan's unfunded vested benefits, (3) the schedule of payments offered to Gray, and (4) the date of Gray's complete withdrawal.

Following receipt of the Decision on Review, Gray could have initiated arbitration of disputes with the Trustees. Gray however, informed the court on February 16, 1982 that it accepted and adopted the Trustees' findings and further stated that it waived the right to arbitration under the MPPAA.

None of the parties disputes the foregoing facts.

BACKGROUND

On September 26, 1980, the MPPAA was signed into law. The MPPAA changed the law governing an employer's withdrawal from pension plans. Under the MPPAA, withdrawal from a multiemployer plan gives rise to a fixed debt owed to the pension plan. The withdrawing employer becomes liable for a proportionate share of the pension plan's unfunded vested liability. The trustees of the pension plan have the duty to calculate and collect the liability. Disputes between an employer and the trustees over the amount or method of assessment go first to arbitration. Although the MPPAA became law on September 26, 1980, the MPPAA expressly provides that the provisions governing withdrawal liability are retroactively applied to withdrawals occurring on or after April 29, 1980. Therefore, an employer withdrawing before September 26, 1980 but after April 29, 1980 is bound by the withdrawal liability provisions of the MPPAA.

GRAY'S CONTENTIONS

Gray contends that the retroactivity of the MPPAA withdrawal provisions is arbitrary, irrational and violates the due process clause of the fifth amendment to the United States Constitution as well as Gray's "rights arising out of contract." Gray also contends that the MPPAA violates the equal protection clause of the fifth amendment to the United States Constitution by irrationally distinguishing between employers who contribute to single-employer plans and those who contribute to multiemployer plans and discriminating against the latter. Gray contends that the MPPAA also violates Article I, Section 9, Clause 3 of the United States Constitution which prohibits the enactment of *ex post facto* laws. Finally, Gray contends that the "compulsory arbitration" provisions of the MPPAA impermissibly curtail the seventh amendment right to a jury trial and violate due process.

The defendants do not dispute Gray's contention that the statute is retroactive.

DUE PROCESS AND RETROACTIVITY

The plaintiff's burden on this issue is set out in *Usery v. Turner Elkhorn Mining*

*Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

428 U.S. at 15, 96 S.Ct. at 2892.

■ In *Nachman Corp. v. Pension Ben. Guaranty Corp.,* 592 F.2d 947 (7th Cir. 1979), *aff'd,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (*Nachman*), the Seventh Circuit held that the retroactive application of Title IV of ERISA did not violate due process. *Nachman* surveyed the precedents and synthesized them in a four-factor analysis of the burden imposed by the challenged legislation. 592 F.2d at 958–60. The four factors are: (1) the reliance interest of the affected parties, (2) whether the interest impaired is in an area previously subjected to regulatory control, (3) the equities of the legislative burdens, and (4) statutory provisions which limit and moderate the impact of the burdens imposed. *Id.* at 960. The four factors describe the burden imposed. In evaluating the statute, the court compares the problem being remedied with the burdens imposed to determine if the legislative remedy is irrational and therefore violates due process. *See Id.*

The parties point to three decisions on the issue which is before me. Plaintiffs point to the two decisions of Judge Hill in *Shelter Framing Corp. v. Carpenters Pension Trust for Southern California,* 543 F.Supp. 1234 (D.C.Cal.1982), and *G & R Roofing Co. v. Carpenters Pension Trust for Southern California,* 543 F.Supp. 1234 (D.C.Cal.1982), in which he held that the retroactive application of the withdrawal provisions was impermissible. Defendant PBGC points to the decision of Judge Getzendanner in *Peick v. PBGC,* 539 F.Supp. 1025 (N.D.Ill.1982), in which she ruled that the retroactive provision of the MPPAA survives a facial attack on due process, equal protection, seventh amendment and contractual impairment grounds.

Both the decisions of Judges Hill and Getzendanner and the briefs of the parties use the four factor analysis of *Nachman.* I agree that it is the appropriate approach.

### A. *Problem to be Remedied*

As originally enacted in 1974, ERISA provided that before January 1, 1978, payment of guaranteed benefits for terminated multiemployer plans was discretionary, and on January 1, 1978, payment of guaranteed benefits for such plans was to become mandatory. 29 U.S.C. § 1381(c). In 1977 Congress became concerned about the effect of implementing the mandatory guarantees, delayed the date for implementation and ordered the PBGC to submit a report on multiemployer plans. *Peick v. PBGC,* 539 F.Supp. at 1030–1031.

The PBGC report, entitled "Pension Benefit Guaranty Corporation, Multiemployer Study, Required by P.L. 95–214," was submitted on July 1, 1978. It contained the following findings, which I take, as quoted, from *Peick v. PBGC* at 1031:

1. There were about two thousand covered multiemployer pension plans with approximately eight million participants. Pension Benefit Guaranty Corporation, Multiemployer Study Required by P.L. 95–214, at 1, 20 (1978) (hereafter cited as PBGC Report).

2. About ten per cent of these plans were experiencing financial difficulties that could result in plan termination before 1988. These plans had about 1.3 million participants. *Id.* at 1, 138.

3. If all of these plans were to terminate, it could cost the insurance system about $4.8 billion to fund all plan benefits then covered by Title IV's guarantee. The annual premium needed to fund this liability would be unacceptably high. *Id.* at 2, 16, 139.

4. Limiting consideration to only those covered multiemployer pension plans which were experiencing sufficiently serious financial difficulties that it was likely they would become insolvent before 1988, the cost to the insurance system to

fund all guaranteed plan benefits could be approximately $560 million. The annual per capita premium needed to fund this liability could rise from fifty cents to as much as nine dollars. *Id.* at 2, 16, 140.

The PBGC report also found that ERISA and particularly Title IV of ERISA, might encourage termination of multiemployer pension plans. PBGC Report at 23–4.

The House Education and Labor Committee concurred in the views of the PBGC:

[T]he corporation's report clearly demonstrates that: (1) the magnitude of the risk and the potential exposure of the system are intolerably high; and (2) existing law and particularly the plan termination insurance provisions are inadequate to assure financially sound multiemployer plans, may accelerate declines and further weaken and hasten the termination of financially weak plans. The committee agrees with the conclusions of the corporation that there are serious defects in current law which undermine the benefit security of multiemployer plan participants.

H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 57, *reprinted in* (1980) Code Cong. & Ad.News 2918, 2925. The Committee also stated that it considered the MPPAA necessary, because failure to act "would create economic havoc and do serious harm to active workers and retirees in, and employers contributing to, multiemployer plans." *Id.,* H.R.Rep. at 64, Code Cong. at 2931–2.

On April 30, 1980, Congress delayed, for the third time, implementation of the mandatory guarantees. In April 1980, the House approved the MPPAA and in July 1980, the Senate did the same. In September 1980, the differences in the two versions were reconciled. *Peick v. PBGC* at 1032–1033.

■ 29 U.S.C.A. § 1001a (Supp.1981) sets forth the Congressional Findings and Declarations of Policy for the MPPAA:

(a) The Congress finds that

. . . .

(3) the continued well-being and security of millions of employees, retirees, and their dependents are directly affected by multiemployer pension plans; and

(4)(A) withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations, and [that]

(B) in a declining industry, the incidence of employer withdrawals is higher and the adverse effects described in subparagraph (A) are exacerbated.

(b) The Congress further finds that

(1) it is desirable to modify the current multiemployer plan termination insurance provisions in order to increase the likelihood of protecting plan participants against benefit losses; and

(2) it is desirable to replace the termination insurance program for multiemployer pension plans with an insolvency-based benefit protection program that will enhance the financial soundness of such plans, place primary emphasis on plan continuation and contain program costs within reasonable limits.

In summary, imposition of withdrawal liability was intended to remove existing statutory incentives for employers to withdraw from troubled or potentially troubled plans, while providing that newly entering employers would not be saddled with obligations incurred prior to their entry into the plan. The withdrawal liability also was intended to insure that a withdrawing employer would fund a share of the obligations incurred during that employer's association with the plan.

B. *Means of Remedying the Problem: The Burden*

1. *The Reliance Interest of the Affected Parties*

■ Gray argues that prior to the enactment of the MPPAA, its sole perceived responsibility was "payment of a defined contribution to a jointly trusteed plan, the success of which did not depend on the employ-

er." However, Section 10.03 of the Plan from which Gray withdrew does contemplate the possibility of change through ERISA:

> *Except for liabilities which may result from provisions of ERISA,* nothing contained in this plan shall be construed to impose any obligation to contribute beyond the obligation of the Employer to make contributions as stipulated in its collective bargaining agreement. (Emphasis added).

Triplett Affidavit at 105. The Plan itself recognized that the employers' obligations were subject to statutory modification.

When the bill containing the MPPAA was originally introduced on May 3, 1979, the bill retroactively applied to withdrawals on or after February 27, 1979. *Peick v. PBGC* at 1053. February 27, 1979 remained the effective date for withdrawal liability until June 1980, when the Senate Finance Committee decided that the February 27, 1979 date was unnecessarily harsh and advanced the date to April 29, 1980. *Id.*

By April 29, 1980, the date which Gray attacks, the MPPAA had already received approval by the House Education and Labor Committee, the House Ways and Means Committee and the Senate Labor and Human Resources Committee. *Id.* Each approved version applied retroactively to withdrawals on or after February 27, 1979. *Id.* at 1053–1054. The pre-enactment circumstances therefore provided employers with some notice that they could not rely on the contribution obligation of their collective bargaining agreements. Judge Getzendanner relied on this history to reason that fair warning of a statute's terms before its enactment can mitigate reliance and pointed to similar reasoning in *United States v. Hudson,* 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937) and in *United States v. Darusmont,* 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981). *Peick v. PBGC,* 539 F.Supp. at 1054–1055.

The employees' reliance on the promise of vested pension benefits must be balanced against the employers' reliance on a defined contribution. I conclude, as did the Congress, that the employees' reliance interest outweighs the employers'. I also conclude that this factor does not weigh against the statute.

### 2. *Previous Regulation of the Area*

Pension plan termination is an area which is heavily regulated by the federal government. *Nachman,* 592 F.2d at 962. Even before ERISA, the area was regulated. *See* Treas. Reg. § 1.401–6, cited in *Nachman,* 592 F.2d at 962, n. 33. As stated above, section 10.03 of the Plan from which Gray withdrew acknowledges ERISA regulation of the employer's liability. As originally enacted, ERISA provided that an employer could incur a withdrawal liability which exceeded the obligation to pay contributions in the situation where a multiemployer plan terminated within five years. 29 U.S.C. §§ 1363, 1364. The previous regulation of this area leads me to conclude that this factor does not weigh against the statute.

### 3. *The Equities*

Congress was concerned that if the MPPAA became effective only upon enactment, passage would precipitate early withdrawals. *Peick v. PBGC* at 1055. Congress had been concerned with the fact that ERISA itself encouraged withdrawals. *Id.* One of the Congressional concerns about early withdrawals was the effect on the relative equities between the early withdrawing employer and the employer who remained in the plan to face even greater liabilities after the enactment of the MPPAA. *Id.* Therefore the equities to be balanced are those between the employees, the withdrawing employer and the remaining employers. In light of the magnitude of the problem being addressed by Congress, I find that the equities balance in favor of the employees and remaining employers when considering the withdrawing employers' incurring a fixed debt upon withdrawal. Gray points to the fact that although Congress feared many withdrawals would be precipitated by the legislation, in fact, they did not occur in great or even significant numbers. The fact that these

fears were not realized does not mean that acts to forestall such events were irrational. I conclude that this factor does not weigh against the statute.

### 4. *Statutory Provisions Limiting and Moderating the Burden*

Gray's position is that the MPPAA contains virtually no provisions which moderate the burden and that the moderating factors fall short of those in the statute upheld in *Nachman.*

The MPPAA does contain some mitigating features. One example is the "*de minimis* rule," 29 U.S.C.A. § 1389(a), which eliminates withdrawal liability for employers whose obligation would be below $50,000 or three fourths of one percent of the plan's unfunded vested obligations. The MPPAA does not require lump-sum payments but permits a schedule of payments under 29 U.S.C.A. § 1399(c).

Judge Hill in *Shelter Framing Corp.* and *G & R Roofing* concluded that the MPPAA had no significant features to moderate the imposition of a large liability, such as were present in *Nachman:* a grace period or a limitation of the employer's liability in relation to the employer's net worth. I agree with Judge Hill that the factor weighs against the statute.

### C. *Conclusion*

Plaintiff carries a heavy burden of showing that the retroactivity of the MPPAA violates due process. To prevail, Gray must show the legislature acted in an "arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. at 15, 96 S.Ct. at 2892. Plaintiff has shown that the MPPAA can and does sometimes exact a heavy burden from an employer who withdraws from a multiemployer pension plan. Gray has also shown that there is a paucity of ameliorating features in the plan adopted. But Gray has not shown that the plan and its retroactive application are irrational solutions to a serious problem. The plaintiff has not carried its burden.

## IMPAIRMENT OF CONTRACT RIGHTS

 The contract clause of the United States Constitution applies only to the states. *Nachman,* 592 F.2d at 959. The due process clause of the fifth amendment is implicated in legislation affecting contract rights. *Id.* at 960. The standard of review for federal legislation affecting or impairing contract rights is not settled. *Id.; Peick v. PBGC* at 1040. I do not decide the standard to be applied, but rule that to the extent that the MPPAA survives Gray's due process claim, it survives Gray's claim of impairment of contract rights. *See Peick v. PBGC* at 1040; *Nachman,* 592 F.2d at 959.

## EQUAL PROTECTION

██ Gray contends that the different treatment of employers in single-employer pension plans and multiemployer pension plans violates the equal protection clause of the fifth amendment. Gray points to two distinctions:

> (1) employers who contribute to a multiemployer plan can be liable upon withdrawal from a plan which continues in existence. Single employers are liable only when a plan terminates.

> (2) single employers cannot become liable for more than thirty percent of their net worth. There is no upper limit on the liability of an employer who contributes to a multiemployer plan.

To prevail on this issue, Gray has the burden of showing that "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–2387, 69 L.Ed.2d 40 (1981).

I find that Gray has not shown that the distinction between multiemployer and single-employer plans is irrational. As stated in the testimony of John B. Hall, Deputy Assistant Secretary for Tax Policy, Department of the Treasury, before a House Committee:

[A]mong defined benefit pension plans, there are wide variations. We quickly despaired of devising a separate system for each type of defined benefit pension plan. Nevertheless, we did find it useful to make a distinction between two broad groups of plans—single-employer plans and multiemployer plans.

Single-employer plans may cover only employees in a single plan or office, or may cover substantially all of a company's employees and plants throughout the country. These plans may or may not be collectively bargained. Most single-employer plans call for a specific benefit amount payable at retirement but do not specify a required employer contribution. They are generally administered by the employer and the employer generally has the right to terminate the plan at any time with no further liability for pension contributions.

Multiemployer plans have significantly different characteristics. They generally require a specific employer contribution. They generally are administered by a joint employer-employee board of trustees which has the authority to set benefits. The employer's obligation is generally limited to making the specific contribution and a participating employer cannot terminate the plan although he may withdraw from it. Because of these differences, it is difficult to draft one insurance program which applies to both types of plans. [Bills to Revise the Welfare and Pension Plans Disclosure Act: Hearings on H.R. 2 and H.R. 462 before the House General Subcommittee on Labor of the Committee on Education and Labor, 93rd Cong. 1st Sess. 768–769 (1973).]

In light of the different makeup of single and multiemployer plans, different treatment of the withdrawals from each is not irrational. The withdrawal from a multiemployer plan, in the absence of withdrawal liability, shifts the burden to remaining employers. This situation does not occur in a single-employer plan.

The elimination of the thirty percent limitation of liability for employers withdrawing from multiemployer plans has a harsh result, but was imposed because Congress wished to deter withdrawals and their deleterious effects. *Peick v. PBGC* at 1057 (citing legislative history). I cannot conclude that the measure was irrational. Congress concluded that there was a great threat to multiemployer plans and took steps to lessen the threat.

I find that Gray has failed to carry its burden of showing that the MPPAA irrationally distinguishes between the multiemployer and single-employer plans.

EX POST FACTO

■ Gray's *ex post facto* argument is without merit. The prohibition of the enactment of an *ex post facto* law applies to a statute which "assigns more disadvantageous criminal or penal consequences to an act than did the law in place when the act occurred." *Weaver v. Graham,* 450 U.S. 24, 29 n. 13, 101 S.Ct. 960, 964 n. 13, 67 L.Ed.2d 17 (1981), *cited in Peick v. PBGC* at 1056, n. 81. No criminal or penal consequences are involved in the statute or fact situation before me.

ARBITRATION PROCEDURE

■ Gray contends that the arbitration procedure of the MPPAA violates the rights to procedural due process and trial by jury. As stated above, Gray waived its right to arbitration under the MPPAA. Gray contends that waiver of the right to arbitrate did not constitute a waiver of the right to attack the validity of the arbitration provisions.

I conclude that Gray has no standing to contest the validity of the arbitration provisions of the MPPAA. To meet the standing requirements of Article III, a plaintiff must show that it "suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant . . . ." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, ——, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). Gray has failed to show that it comes within the "actual injury" requirement with respect to the arbitration provisions of the MPPAA.

CONCLUSION

The MPPAA survives Gray's motion for summary judgment. I conclude that summary judgment should enter in favor of the defendant.