The **WASHINGTON STAR COMPANY**, Plaintiff,

v.

**INTERNATIONAL TYPOGRAPHICAL UNION NEGOTIATED PENSION PLAN, Defendant.**

Civ. A. No. 82–1568.

United States District Court, District of Columbia.

Feb. 9, 1983.

Lawrence D. Levien, David P. Callet, Betty Leach, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for plaintiff.

Michael F. O'Toole, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, for defendant.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

The plaintiff, the Washington Star Company (the Star), challenges the constitutionality of withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 (the Act or MPPAA). For the reasons stated below, the Court finds the challenged provisions constitutional. Defendant's motion for summary judgment is granted, and this action is dismissed.

## I. Factual Background and Challenged Provisions of the Act

The defendant is the International Typographical Union Negotiated Pension Plan (the Plan). The Plan was created as a trust in September 1966 to administer an employee pension trust fund. It is funded by contributions of employers maintaining collective bargaining agreements with locals of the International Typographical Union (ITU). A board of trustees administers the Plan. Trustees are selected in equal numbers by the ITU Executive Council and by employers contributing to the trust. The Plan is a multiemployer plan, since more than one employer is required to contribute pursuant to a number of collective bargaining agreements between different locals of the ITU and various employers. *See* 29 U.S.C. § 1002(37) (Supp.1982) (definition of multiemployer plan).

In or about 1967, the Star began contributing to the Plan pursuant to the terms of a collective bargaining agreement with the Columbia Typographical Union, a local of the ITU. When the Star stopped publishing its newspaper and terminated all employees covered by the Plan on August 7, 1981, it ceased contributions and withdrew from the Plan. The Plan then assessed against the Star a withdrawal liability of $485,007, payable in six quarterly installments of $79,024 and a final quarterly installment of $51,843 (totaling $525,987 including interest).

The Multiemployer Pension Plan Amendments Act amended the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, and portions of the Internal Revenue Code of 1954. One of those changes increased liability for employers withdrawing from multiemployer plans on or after April 29, 1980.

The Act permits the trustees of a multiemployer plan to choose one of three methods to calculate an employer's withdrawal liability. 29 U.S.C. § 1391(a) (Supp.

1982). The statutory presumptive method chosen by the Plan here makes a withdrawing employer who was contributing to the Plan on April 29, 1980 liable for its proportional share, based on the employer's percentage of total plan contributions, of all the unfunded vested benefits accumulated in the Plan prior to April 29, 1980. *Id.*, § 1391(b)(1)(B). The withdrawing employer is also liable for its proportional share of the Plan's unfunded vested benefits for subsequent plan years in which the employer contributed. *Id.*, § 1391(b)(1)(A).

After paying two quarterly installments, the Star filed this action against the Plan. On June 18, 1982, the Court denied plaintiff's request for a preliminary injunction to enjoin collection of the assessed liability until a ruling on the merits. On October 21, 1982, the Court stayed discovery pending decision on the Plan's motion for summary judgment.

The Star argues that the statutory presumptive method of calculating withdrawal liability, 29 U.S.C. § 1391(b) (Supp.1982), permits a taking of property without due process of law in violation of the Fifth Amendment to the United States Constitution because a withdrawing employer's liability is not limited to the amount necessary to fund its own employees' vested benefits. Stated in reverse, the Star asserts that the Constitution forbids placing liability on an employer withdrawing from a multiemployer plan for amounts attributable to the unfunded vested benefits of employees of other contributors.

Other provisions of the Act, the Star contends, violate procedural due process rights under the Fifth Amendment and the Seventh Amendment right to a jury trial. The Act provides that the trustees of a plan determine initially the liability of a withdrawing employer. 29 U.S.C. § 1399(b)(1) (Supp.1982). Disputes over the liability assessed must be taken to arbitration. To prevail, the withdrawing employer must show by a preponderance of the evidence that the plan's determination was unreasonable or clearly erroneous. *Id.*, § 1401(a)(3). To overturn the arbitra-tor's findings in federal district court, the appealing party must show by a clear preponderance of the evidence that the findings were incorrect. *Id.*, § 1401(c). The Star argues that the trustees' statutory obligation to preserve and enhance plan assets disqualifies them as impartial decisionmakers. Further, the absence of a right to jury trial offends the Seventh Amendment, according to the Star.

## II. Multiemployer Pension Plans

Before assessing the background and constitutionality of the challenged provisions of the Act, it is relevant to explain briefly some characteristics of multiemployer pension plans.

In single employer pension plans, all contributions go toward benefits for employees of the sole contributing employer. In a multiemployer plan, all of the assets are pooled to pay benefits of all participants, without regard to which contributing employer the participant worked for.

The contributions of a particular employer do not match benefits paid to that employer's employees for several reasons. First, employees receive credit for service in the industry prior to their employer joining the plan. When the Star joined the Plan, for example, its employees received past service credit for years of continuous employment as journeymen before 1967. Some Star employees received past service credit from as early as 1941. This past service credit constituted an unfunded liability of the Plan since contributions had not been received to pay these credits. Affidavit of Carl Hatton, administrator of the Plan, in support of motion for summary judgment and motion to stay discovery, ¶ 9; Affidavit of Michael Kaplan, senior vice president of Martin E. Segal Company, actuaries for the Plan, June 15, 1982, ¶ 3. Second, the amount a participant receives as pension benefits depends on how long the pensioner lives and the age at which he retires or becomes disabled. Affidavit of Carl Hatton, *supra,* ¶ 9. Third, an employer may contribute on behalf of employees whose pension rights never become vested.

These contributions are not returned to the employer; they are credited to the general assets of the plan. *Id.*

The assets of multiemployer plans are accumulated through employer contributions and earnings on investment of the trust fund. If the assets are sufficient to pay employee benefits when they become due, the plan is deemed fully funded. A plan has unfunded liability to the extent that the estimated future value of its assets is insufficient to meet the plan's estimated future payment obligations. 29 U.S.C. § 1393(c) (Supp.1982). The ITU Negotiated Pension Plan calculated its unfunded present value of vested benefits through December 31, 1980 to be $96,279,500. Affidavit of Michael O'Toole in support of motion for summary judgment and motion to stay discovery, ¶ 17; *see* 29 U.S.C. § 1391(b)(1)(A) and (B) (Supp.1982) (explaining calculation of unfunded benefits are based on plan years). The Plan's assets total over $200 million and its income in 1981 was over $20 million. Affidavit of Michael Kaplan, *supra,* ¶ 10.

The House Education and Labor Committee emphasized in its report accompanying the MPPAA bill that multiemployer plans have benefited employees by enabling them to move from one contributing employer to another without losing service credit. In addition, the Report noted that employees do not lose service credit if their employer ceases contributing to the plan. H.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 53 (1980) U.S.Code Cong. & Admin. News 1980, 2918. Multiemployer plans also give certain advantages to employers: the added stability of having many contributing employers, decreased administrative costs, and the ability to hire new, skilled employees who do not lose accrued pension benefits.

### III. Background to the Act

The MPPAA was passed in large measure to preserve the financial integrity of multiemployer pension plans. Currently, about 2,000 multiemployer plans cover approximately 8,000,000 participants, work-

ers, and retirees. Prior to the passage of ERISA in 1974, financial instability was not an identifiable problem because "participation in such plans and the industries they covered generally continued to grow in the 2½ decades before passage." H.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 54 (1980), U.S.Code Cong. & Admin. News 1980, p. 2922. In recent years,

> external economic factors such as technological obsolescence in certain crafts such as printing ... have resulted in a significant decline in the number of contributors or the number of active employees in the contribution base, and an increasing proportion of retirees to active workers.

*Id.*

ERISA established a termination insurance program for single employer plans to insure plan participants against loss of benefits in the event their plan terminated with insufficient assets to pay benefits. The Pension Benefit Guaranty Corporation (PBGC) was formed as an independent corporation within the Department of Labor to administer the termination insurance program. *See* 29 U.S.C. § 1302. Congress did not make the PBGC insurance program effective immediately for multiemployer plans, but permitted the PBGC to insure them on a case by case basis. Guaranteed coverage was not established for multiemployer plans until passage of the MPPAA.

The PBGC submitted two reports to Congress, in September 1977 and July 1978, concerning multiemployer plans. H.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 55–56 (1980). The PBGC's legislative recommendations, which were enacted without substantial change, were submitted in February 1979 and May 1979. *Id.,* at 57. The House Labor and Education Committee concluded from those reports that the risk and potential exposure of multiemployer plans were intolerably high and that existing law was inadequate to assure financially sound plans and may even have accelerated declines. *Id.*

The Committee found that ERISA rewarded employers who withdrew from a

plan and penalized employers remaining. *Id.*, at 60. Under the 1974 legislation, a withdrawing employer incurred liability only in the unlikely event of termination of the plan within five years of the employer's withdrawal. 29 U.S.C. § 1364(a).

Although liability was contingent, it is relevant to note that the pre-MPPAA formula was based on a proportional share of unfunded vested benefits of the entire plan, not just the employees of the withdrawing employer. *Id.*, §§ 1364(b); 1362(b)(1). The withdrawing employer's liability was limited to 30% of the employer's net worth. *Id.*, § 1362(b)(2). The rules made withdrawal liability unlikely and, in any event, limited. Remaining contributors were left to pick up the withdrawing employer's share of the plan's unfunded vested obligations. Congress adopted the PBGC's view that those rules unfairly burdened employers remaining in the plan. H.Rep. No. 96–869, 96th Cong., 2d Sess. 60 (1980).

Congress made findings and declarations of policy in the Act that

(1) multiemployer plans ... are affected with a national public interest;

(2) multiemployer plans have accounted for a substantial portion of the increase in private pension plan coverage over the past three decades;

(3) the continued well-being and security of millions of employees, retirees, and their dependents are directly affected by multiemployer pension plans; and

(4)(A) withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, adversely affecting the plan, its participants and beneficiaries, and labor-management relations, and

(B) in a declining industry, the incidence of employer withdrawals is higher and the adverse effects described in subparagraph (A) are exacerbated.

29 U.S.C. § 1001a (Supp.1982).

The Act insulated subsequent entrants from withdrawal liability for a plan's un-

funded vested benefits accumulated before the date of joining. 29 U.S.C. § 1391(b)(3) (Supp.1982). Congress gave entrants this protection "to avoid creating a severe disincentive to new employers entering a plan." H.Rep. No. 96–869, Part I, 96th Cong., 2d Sess. 67 (1980), U.S.Code Cong. & Admin. News 1980, 2935.

### IV. Constitutionality of the Act
#### A. Substantive Due Process

■ The legal standards for analyzing the Star's substantive due process challenge to the Act are set forth in *Usery v. Turner Elkhorn Mining Co. (Usery)*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), and *Nachman Corporation v. Pension Benefit Guaranty Corporation (Nachman)*, 592 F.2d 947 (7th Cir.1979), *aff'd*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

In *Usery*, the Supreme Court rejected unanimously a substantive due process challenge to a federal statute imposing liability on coal mine operators for pneumoconiosis (black lung disease) suffered by miners. The Supreme Court noted the well-established presumption of constitutionality given legislation adjusting the benefits and burdens of economic life. *Usery v. Turner Elkhorn Mining Co., supra*, 428 U.S. at 15, 96 S.Ct. at 2892. To succeed, the challenger must "establish that the legislature has acted in an arbitrary and irrational way." *Id.* Such legislation is not unlawful "solely because it upsets otherwise settled expectations." *Id.*, at 16, 96 S.Ct. at 2893.

The mine operators in *Usery* challenged the constitutionality of "basing liability upon past employment relationships, rather than taxing all coal mine operators presently in business." *Id.*, at 18, 96 S.Ct. at 2893. The Star in this case argues the reverse: employment relationship, it contends, is the only constitutional method of apportioning liability of a plan's underfunding. The Supreme Court found "the imposition of liability for the effects of disabilities bred in the past" a rational measure to spread the costs of the employees' disabilities to the

operators and the coal consumers. *Id.* Turning to Congress' choice of imposing liability on all mine operators, the Court held

> (I)t is for Congress to choose between imposing the burden of inactive miners' disabilities on all operators ... or to impose that liability solely on those early operators whose profits may have been increased at the expense of their employees' health. We are unwilling to assess the wisdom of Congress' chosen scheme by examining the degree to which the "cost savings" enjoyed by operators in the pre-enactment period produced "excess" profits, or the degree to which the retrospective liability imposed on the early operators can now be passed on to the consumer. *It is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension* (emphasis added).

428 U.S., at 18–19, 96 S.Ct. at 2893–94.

*Nachman* posed a substantive due process challenge to termination liability rules for single employer pension plans under section 4062(b) of ERISA, 29 U.S.C. § 1362(b). *Citing Usery v. Turner Elkhorn Mining Co., supra,* and *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), the *Nachman* court considered four factors in evaluating a burden of retroactive liability: (1) the reliance interests of the parties affected; (2) whether the burden was imposed in an area previously subject to regulatory control; (3) the equities of imposing the burdens; and (4) the existence of statutory provisions to limit and moderate the impact of the burdens. *Nachman Corporation v. Pension Benefit Guaranty Corporation,* 592 F.2d, at 960. In comparing the problem to be remedied with the nature and scope of the burden imposed to remedy it, the *Nachman* court cautioned that the four factors "must only be used to determine whether the legislation represents a rational means to a legitimate end." *Id., citing Usery v. Turner Elkhorn Mining Co.,* 428 U.S., at 18–19, 96 S.Ct. at 2893–94.

The Plan argues that the Act does not impose retroactive liability. The Court disagrees. Although the Act is generally prospective, looking towards withdrawals in the future,[1] it imposes liability for past underfunding where liability previously had been more restricted and only contingent. *See Nachman Corporation v. Pension Benefit Guaranty Corporation, supra,* at 958 (legislation invalidating contractual exclusions from liability is retroactive in effect).

### 1. Reliance Interests

The principle requiring an employer to pay a proportional share of a multiemployer plan's underfunding is neither unfair nor unexpected. The Star was well aware when it joined the Plan in 1967 that the nature of a multiemployer pension plan is the pooling of assets in one fund from contributions of all employers. The Star could not have been surprised by the withdrawal formula because the contingent liability under pre-Act ERISA rules was also based on a proportional share of plan underfunding.

The employees' reliance interests in maintaining the financial integrity of multiemployer plans were emphasized in the Act; Congress imposed withdrawal liability only for *vested* benefits, to protect justifiable reliance interests of plan participants. *See Nachman Corporation v. Pension Benefit Guaranty Corporation,* 592 F.2d, at 962. The problems facing multiemployer plans and proposed remedies were a matter of public record since at least July 1978, when the PBGC made its first report to Congress on the subject. Congress determined that the security of multiemployer pension plans was a problem of national

---

1. The withdrawal liability provisions of the Act were made effective the date of Congressional passage, April 29, 1980, rather than the date of enactment into law by the President signing the bill, September 26, 1980. *See* 29 U.S.C. § 1391 (Supp.1982).

importance. 29 U.S.C. § 1001a (Supp. 1982).

*Railroad Retirement Board v. Alton Railroad Co. (Alton)*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) and *Allied Structural Steel Co. v. Spannaus (Spannaus)*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), cited by plaintiff, presented different situations. In *Alton*, the Supreme Court held unconstitutional a federal statute that established a pension system for all employees of common carriers regulated by the Interstate Commerce Act. In *Spannaus*, the Court applied the Contracts Clause of the Constitution, Article I, § 10, cl. 1, to invalidate a Minnesota statute requiring employers to pay unvested benefits upon ceasing operations in that state. The statutes in *Alton* and *Spannaus* expanded eligibility for pension benefits. No employees' reliance interests were implicated in those cases. In contrast, the withdrawal provisions of the MPPAA merely adjust the burdens of preserving *vested* benefits.

### 2. Prior Regulation

Withdrawal from multiemployer plans had been regulated since the passage of ERISA in 1974. That the liability was then contingent and lesser does not prevent the legislature from buttressing the law "by subsequent amendments to achieve the legislative end," *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958).

### 3. The Equities

While defendant and *amicus* compare the burden on the Star with the interests of employees, the Star focuses on a comparison with other classes of employers.

First, the Star contends the Act treats it unfairly compared with employers who were contributors to the Plan before the Act and have remained. It is true that the plaintiff was assessed a proportional share of the Plan's underfunding and that contributors remaining in the Plan are not assessed such amounts exclusively for underfunding. However, contributions from remaining contributors help pay the Plan's underfunding, too. The remaining employers thus share some of the burden of paying of a plan's unfunded vested benefits.

More inequitable is the comparison of the Star with employers, if any, who may have joined the Plan since the Act and later withdrew. The latter employer pays only a proportional share of unfunded vested benefits which accumulated during the plan years in which it contributed. Unfunded vested benefits accumulated before that employer joined the plan are left to be paid by employers such as the Star and by employers remaining in the plan. Congress made this distinction to avoid creating a disincentive for potential entrants. While the Court may not have struck the same balance, the distinction made by Congress is rational and consequently satisfies due process under the standards set forth in *Usery* and *Nachman*.

The Star also compares itself with employers who withdrew from multiemployer plans prior to passage of the Act and were protected by the looser standards then in effect. Plaintiff does not contend that Congress could have imposed liability constitutionally on such employers who were no longer contributors to a plan. A comparison of burdens of employers withdrawing before passage of the Act and afterwards is not of constitutional significance.

The Constitution requires only that the Act "approach the problem of cost spreading rationally." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 19, 96 S.Ct. 2882, 2894, 49 L.Ed.2d 752 (1976). In essence, Congress assessed liability against employers withdrawing from multiemployer pension plans as one method of better insuring the vested benefits of plan participants. Since contributions from employers remaining in the plan also go towards satisfying unfunded vested obligations, the Court considers imposition of proportional liability on withdrawing employers a rational approach. There are rational reasons for Congress to have exempted from pre-Act liability employers who had already withdrawn before passage of the Act and em-

ployers who would join subsequent to the Act.

### 4. Moderating Provisions

Several provisions of the Act moderate the impact of liability on some withdrawing employers. Under the *de minimus* section, withdrawal liability is eliminated if it is the lesser of $50,000 or .75% of a plan's unfunded vested liability. Liabilities between $50,000 and $150,000 are also reduced somewhat. 29 U.S.C. § 1389 (Supp. 1982). Withdrawing employers in liquidation or dissolution are entitled to a reduction of 50% of their liability. *Id.*, § 1405(b). Liability is abated if the employer later rejoins the plan. *Id.*, §§ 1387, 1388.

The Star points out that the provisions moderating the impact of post-Act withdrawal for employers with lesser liability (small contributors) and for employers in bankruptcy actually increase the remaining pool of unfunded vested benefits from which its proportional liability is assessed. *See* 29 U.S.C. § 1391(b)(1)(C) (Supp.1982). Congress, however, made a rational determination that small or bankrupt contributors were entitled to greater consideration than other employers who were better off.

The Act also imposed contingent burdens on employees. The Act subjects vested benefits and guaranteed benefits to reductions in the event of termination or insolvency of the plan. *Id.*, §§ 1426, 1441. The burdens imposed on employees are contingent on the plan's failure or near failure. Here, the plan is solvent and plan participants have not made any sacrifices comparable to the burden on the Star of approximately half a million dollars. However, Congress' concern was to maintain the financial integrity of multiemployer pension plans at the expense of solvent employers prior to demanding sacrifices from employees.

The Court concludes that the statutory presumptive method of calculating withdrawal liability in the Act, 29 U.S.C. § 1391(b) (Supp.1982), is rational and, therefore, constitutional.

### B. Procedural Due Process and the Right to Jury Trial

 The Plan contends that by failing to contest its liability through arbitration, the Star lacks standing to test the statutory procedures in court, citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982). The Court disagrees. In contrast to the lack of personal injury in *Valley Forge*, the Star has clearly suffered economic injury by being assessed nearly half a million dollars in withdrawal liability. Where, as here, a party challenges a statute's constitutionality, it need not pursue the administrative scheme established by that statute. *See Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290 (3d Cir.1982) (district court must rule on constitutionality of procedural provisions of MPPAA even though employer did not pursue arbitration). The Court rejects the Plan's standing argument and considers plaintiff's objections on their merits.

 The statutory scheme assigning initial determination of liability to plan trustees is a rational approach to setting withdrawal liability. The trustees choose among statutory calculation methods, and their accountants determine liability using the selected method. There are no issues of disputed fact as in *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (board of optometrists determined fitness to practice optometry); *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (mayor determined guilt or innocence of defendant); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (same). The trustees are obligated by statute to act in a fair manner and impartially; their duty to the plan to maintain plan assets does not permit them to cheat employees or employers, and the Court cannot assume that such a rare occurrence goes uncorrected or renders the statutory scheme unconstitutional as a violation of due process.

 The Seventh Amendment provides that "In suits at common law, where the

value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Seventh Amendment does not apply where the proceeding is not in the nature of a suit at common law. *N.L. R.B. v. Jones & Laughlin Steel Corporation*, 301 U.S. 1, 48, 57 S.Ct. 615, 629, 81 L.Ed. 893 (1937), *citing Guthrie National Bank v. Guthrie*, 173 U.S. 528, 537, 19 S.Ct. 513, 516, 43 L.Ed. 796 (1899). Here, Congress established a constitutionally valid procedure for the trustees of a pension fund to fix, demand, defend in arbitration, and enforce in court, if necessary, a withdrawing employer's liability imposed by statute. The Seventh Amendment is therefore inapplicable. *See N.L.R.B. v. Jones & Laughlin Steel Corporation*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (Seventh Amendment inapplicable in resolving unfair labor practice complaints, where jury trial would substantially interfere with agency's role in statutory scheme); *Katchen v. Landy*, 382 U.S. 323, 339, 86 S.Ct. 467, 478, 15 L.Ed.2d 391 (1966) (allowing jury trial of legal claim in bankruptcy proceeding would dismember statutory scheme).

### V.

The Court's analysis conforms with the decisions reached by every other court which has thus far considered the constitutionality of the withdrawal liability provisions of the Act. *See, e.g., Peick v. Pension Benefit Guaranty Corporation*, 539 F.Supp. 1025 (N.D.Ill.1982); *S & M Paving, Inc. v. Construction Laborers Pension Trust*, 539 F.Supp. 867 (C.D.Cal.1982); *Trustees of the Retirement Fund of the Fur Manufacturing Industry v. Lazar-Wisotzky*, 550 F.Supp. 35, 36 (S.D.N.Y. 1982); *R.A. Gray & Co. v. Oregon-Washington Carpenters-Employers Pension Trust Fund*, 549 F.Supp. 531 (D.Ore.1982); *International Multifoods Corporation v. Central States, Southeast and Southwest Areas Pension Fund*, No. 81–C–6927 (N.D. Ill. April 22, 1982) (memorandum opinion and order); *The Terson Company v. Pension Benefit Guaranty Corporation*, 565 F.Supp. 203 (N.D.Ill.1982) (memorandum opinion); *Eberhard Foods, Inc. v. Retail Store Employees Unions AFL–CIO*, No.

G82–23 CA1 (W.D.Mich. March 8, 1982) (memorandum opinion); *Victor Construction Company v. Construction Laborers Pension Trust*, 3 Employee Benefit Cases (E.B.C.) 1763 (C.D.Cal.1982); *Ells v. Construction Laborers Pension Trust of Southern California*, 3 E.B.C. 1449 (C.D. Cal.1982); *Coronet Dodge, Inc. v. Speckmann*, 553 F.Supp. 518 (E.D.Mo.1982) (memorandum and order); *Pacific Iron & Metal Co. v. Western Conference of Teamsters Pension Trust Fund*, 553 F.Supp. 523 (W.D.Wash.1982) (order and judgment).

In *Shelter Framing Corporation v. Carpenters Pension Trust*, 543 F.Supp. 1234 (C.D.Cal.1982), the Court held that the Act violated substantive due process as applied to employers withdrawing between passage of the Act on April 29, 1980 and enactment on September 26, 1980. The *Shelter Framing* court, however, left open the constitutionality of the Act as applied to employers, such as the Star, who remained in pension plans after the Act's enactment date. *Id.*, at 1255.

Even assuming that the plaintiff had to pay more than the underfunding attributable to its own employees, as the Star seeks to show through discovery, the Act violates neither the Star's rights to due process under the Fifth Amendment nor its Seventh Amendment right to a trial by jury for suits at common law.