DORN'S TRANSPORTATION, INC.,
Oneida Motor Freight, Inc.,
Plaintiffs,

v.

I.A.M. NATIONAL PENSION FUND,
BENEFIT PLAN A, Defendant.

Civ. A. No. 82–1141.

United States District Court,
District of Columbia.

Jan. 19, 1984.

Linda High, Washington, D.C., for plaintiffs.

Robert R. Osgood, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

The case now before the Court on defendant's Motion for Summary Judgment presents another of the proliferate constitutional challenges to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"), Pub.L. No. 96–364, 94 Stat. 1208 (1980), codified at 29 U.S.C. § 1001a et seq. (Supp. V 1981).

By complaint filed April 26, 1982, plaintiffs Dorn's Transportation, Inc. ("Dorn's") and Oneida Motor Freight, Inc. ("Oneida") contest the validity of the MPPAA under the Due Process and Taking clauses of the Fifth Amendment, and the Seventh Amendment. The importance of these issues is manifest not only by the sheer volume of related litigation among a majority of the circuits,[1] but also by the recent grant of probable jurisdiction by the Supreme Court to review the Act's constitutionality as retroactively applied.[2] In addressing the issues raised by this facial attack, the Court is presented with not only a dispute among the circuits but with differing analyses of the problem. This Court will therefore consider anew the constitutional issues. Based upon the following opinion, summary judgment will be entered for the defendant, finding the statute constitutionally valid, there being no material facts at issue.

## I. Factual and Procedural Background/Issues Presented

In 1979, Dorn's, an interstate motor freight common carrier, entered into a collective bargaining agreement with District 838 of the International Association of Machinists ("the Union"). Pursuant to this agreement, Dorn's contributed on behalf of its employees until March 1981 to the defendant IAM National Pension Fund, Bene-

---

1. The Pension Benefit Guaranty Corporation ("PBGC") has compiled an impressive if incomplete list of one hundred and thirty-eight (138) cases attacking the MPPAA on constitutional grounds. Jurisdictional Statement of the Appellants in *Pension Benefit Guaranty Corp. v. R.A.*

*Gray & Co.,* No. 83–2451, probable jurisdiction noted and case consolidated with *OR–WA Carpenters-Employers v. R.A. Gray & Co.,* No. 83–29, 52 U.S.L.W. 3308 (Oct. 18, 1983).

2. *Supra,* n. 1.

fit Plan A ("Fund"), a multiemployer plan. On March 2, 1981, Oneida, also an interstate motor common carrier of freight, contracted with Dorn's to purchase all outstanding Dorn's stock and thus assume ownership and control over the Dorn's corporation, subject to approval by the Interstate Commerce Commission. Temporary authority was granted to Oneida on March 5, 1981 to lease and control Dorn's pending final ICC disposition of the stock acquisition application.

On March 9, 1981, Dorn's closed its terminal in Albany, New York, releasing from employment its seventeen mechanics. Simultaneously, Oneida proposed hiring the severed Dorn's employees. Although most accepted Oneida's offer, several of these workers sought employment elsewhere. Others chose early retirement. Under the terms of a collective bargaining agreement between Oneida and the International Brotherhood of Teamsters, Local 294, pension contributions for those who joined Oneida were deposited with the Teamsters fund. All contributions by either Dorn's or Oneida to the IAM fund promptly ceased.

The stock purchase agreement received ICC approval on September 17, 1981 and became final. Pursuant to 29 U.S.C. §§ 1381, 1383, the Fund considered Dorn's to have completely withdrawn from the plan. The Fund's trustees notified Dorn's by letter dated February 24, 1982 of its proportional share of the plan's unfunded vested benefits liability.[3] As calculated under the "presumptive method," 29 U.S.C. § 1391(b), the Fund assessed Dorn's liability in the amount of $61,346.

Plaintiffs did not seek arbitration in this case under 29 U.S.C. § 1401, but instead filed on April 26, 1982 a Complaint for Declaratory and Injunctive Relief, alleging as follows:

1. Section 4201 of the Act, 29 U.S.C. § 1381, retroactively imposes liability upon Dorn's and Oneida as determined by fac-

tors outside their control and unrelated to any actions of either plaintiff, thus depriving plaintiffs of property without due process of law as prohibited by the Fifth Amendment of the United States Constitution.

2. Section 4219 of the Act, 29 U.S.C. § 1399, requires payment of liability prior to any hearing, thus depriving plaintiffs of property without due process of law, as prohibited by the Fifth Amendment.

3. Sections 4201 and 4203 of the Act, 29 U.S.C. §§ 1381, 1383, impose and assess withdrawal liability under standards and methods that are so ambiguous and vague as to afford no means of determining accurately when and to what extent liability will be imposed, thus depriving plaintiffs of property without due process as prohibited by the Fifth Amendment.

4. Section 4201(a) of the Act, 29 U.S.C. § 1381(a), deprives plaintiffs of the benefit of their bargain and of the pre-enactment right to withdraw from the Fund without liability, and without compensation to plaintiffs, and thus constitutes an impermissible "taking" under the Fifth Amendment.

5. Section 4221 of the Act, 29 U.S.C. § 1401, compels arbitration in lieu of fact-finding by a jury, thus violating the Seventh Amendment.

6. Section 4221 of the Act, 29 U.S.C. § 1401, accords the findings of fact by the Fund—a "self-interested party"—and the findings of the arbitrator an "irrebuttable" presumption of correctness; and precludes the assertion of constitutional defenses before an arbitrator, in derogation of the plaintiffs' procedural due process rights under the Fifth Amendment.

By letter dated June 29, 1982, plaintiffs' counsel withdrew their request for a preliminary injunction. Defendants moved on July 23, 1982 for summary judgment, which motion was heard and taken under advisement by this Court on November 18,

---

**3.** "Unfunded vested benefits," as defined under 29 U.S.C. § 1002, is that portion of the present value of immediate or deferred pension benefits available to employees covered by a multiem-

ployer plan at normal retirement age, which has not been funded by prior employer contributions.

1982. Pursuant to the requests of counsel at the summary judgment hearing, this Court issued the following day an Order directing counsel to submit further factual materials and stipulations by January 18, 1983, and supplemental memoranda by February 1, 1983. The Court further denied plaintiffs' request to reopen discovery, finding that the pre-arbitration posture of the case, the lack of actual injury, and the option to submit expert affidavits and a stipulated factual record obviated the immediate need for additional discovery. By Order of January 20, 1983, pursuant to joint motion by the parties, an extension of the time for filing of said materials was granted. Upon motion by the plaintiffs, this Court on March 4, 1983 granted a further extension of the time for filing supplemental materials until March 21, 1983, and for filing supplemental memoranda until March 28, 1983. By the same order, this Court again denied on the same grounds plaintiffs' renewed motion to reopen discovery. Plaintiffs' subsequent motion for expedited reconsideration of the Order of March 4, 1983 was denied on March 16, 1983, and plaintiffs were directed to comply with the prescribed pretrial procedures and dates. Two affidavits were filed on behalf of the plaintiffs on March 21, 1983, and supplemental memoranda and factual statements from each party were submitted to the Court by the March 28, 1983 deadline.

II. Exhaustion of Administrative Remedies

A threshold issue must be decided as to whether judicial review of the constitutionality of the MPPAA may be granted the plaintiffs prior to exhaustion of the mandated administrative remedy, *i.e.*, arbitration. 29 U.S.C. § 1401(a)(1). That section provides, in pertinent part, that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 4201 through 4219 [29 U.S.C. §§ 1381–1399] shall be resolved through arbitration." For all determinations as to the existence and amount of liability, the Act invokes those policies underlying initial resort to administrative remedies: To streamline the adjudicative process, *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938); to afford all parties as well as the courts the benefits of the arbitrator's experience and expertise; to compile an adequate record for judicial review; and to prevent premature interference with the administrative process. *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975). *See also N.C. P.A.C. v. Federal Election Commission*, 626 F.2d 953, 957 n. 8 (D.C.Cir.1980); *Blitz v. Donovan*, 538 F.Supp. 1119, 1124 (D.D. C.1982).

 Despite the inherent virtues of these policies favoring prior arbitration, the exhaustion requirement must be evaluated in light of the circumstances presented by each case. *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *Ass'n of Nat'l Advertisers, Inc. v. Federal Trade Comm'n*, 627 F.2d 1151, 1156 (D.C.Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980). If, for example, a challenge were founded upon a particular question of law and fact, *e.g.*, whether a "withdrawal" has occurred, or whether a party was an "employer" within the meaning of the Act, prior adjudication by an arbitrator would be an appropriate prerequisite to judicial "as applied" constitutional review. But where, as here, the complaint poses a facial challenge[4] to the constitutionality of the Act, the purposes of the exhaustion doctrine would not be served by its application. The questions of law

---

**4.** Notwithstanding the facial character of the claims lodged in the complaint, plaintiffs argued in their briefs and at the hearing on summary judgment for a decision as applied. Given the nature of the claims raised in the complaint, the lack of specific, relevant facts adduced at hearing or in plaintiffs' supplemental submissions, and the Court's finding as to the exhaustion requirement, the Court reviews the issues presented as a facial constitutional challenge. *See Peick v. PBGC*, 724 F.2d 1247, 1261 n. 16 (7th Cir.1983).

presented are triable upon a stipulated factual record sufficient to determine the justiciability of the claims at bar. No factual issues essential to this determination are in dispute, thus obviating the need or desirability for a complete factual record, and for the expertise of an arbitrator. Moreover, consideration of the issues presented will not promote future piecemeal attacks on the administrative process, since purely constitutional questions generally are thought beyond the ambit of administrative proceedings. *See Blitz v. Donovan*, 538 F.Supp. at 1124, *citing Oestereich v. Selective Service Local Board*, 393 U.S. 233, 242, 89 S.Ct. 414, 419, 21 L.Ed.2d 402 (1968) (Harlan, J., concurring). A decision rendered by this Court will not usurp the arbitrator's discretion, nor weaken the effectiveness of arbitration, nor disturb the efficiency of the adjudicative process. *McKart v. United States*, 395 U.S. at 193–95, 89 S.Ct. at 1662–63; *Association of Nat'l Advertisers*, 627 F.2d at 1156–57. Upon the circumstances presented by the parties in this case, the Court finds the purposes of the exhaustion doctrine will not be served by referring purely legal questions to arbitration at this time.

III. Analysis

A. Substantive Due Process Claims Under the Fifth Amendment.

█ Due process analysis of the constitutionality of economic regulation begins with the principle that "legislative Acts adjusting the burdens and benefits of economic life come ... with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. *See, e.g., Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487–488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955)." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), cited in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57

L.Ed.2d 595 (1978). Where the ends of the statutory scheme are legitimate, and the means to accomplish those ends are rational, the challenged economic regulation will pass muster under the due process clause of the Fifth Amendment.

█ For legislation of express retroactive as well as prospective effect, the same standard will be applied; but separate rationales must justify each. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 17–18, 96 S.Ct. at 2893. Because the MPPAA was signed into law by President Carter on September 26, 1980 with an effective date of April 29, 1980, any retrospective liability imposed by the Act upon these plaintiffs must satisfy due process on independent grounds. Although plaintiffs in this case withdrew from the Fund in March 1981, or more than five months after the Act was signed into law, the MPPAA attaches automatic withdrawal liability that was contingent at the time Dorn's and the Union entered into their collective bargaining agreement. In this respect only, the MPPAA may be said to retroactively affect the plaintiffs at bar. *The Washington Star v. International Typographical Union Negotiated Pension Plan*, 4 E.B.C. 1145, 582 F.Supp. 301 at ___ (D.D.C.1983) (June Green, J.).

1. The Legitimacy of the Legislated Ends

A number of prior cases, most notably *Peick v. Pension Benefits Guaranty Corp.*, 539 F.Supp. 1025 (N.D.Ill.1982), *aff'd*, 724 F.2d 1247 (7th Cir.1983), have amply reviewed the legislative history of the Employee Retirement Income Security Act ("ERISA") and the MPPAA. In brief, Congress designed the Act

to promote benefit security for multiemployer plan participants through the melioration of the financial condition of multiemployer plans, the elimination of incentives for plan termination, the provision of assistance to insolvent plans, and the establishment of the guarantee program on a fiscally sound basis at a reasonable cost to the premium payers.

H.R.Rep. No. 96–869, Part I, 96th Cong., 2nd Sess. 51–52 (1980), reprinted in 1980 U.S.Code Cong. & Ad.News 2918, 2919–20. In 1977, Congress learned that several major contributors to multiemployer plans intended to withdraw from their plans as of January 1, 1978, to take advantage of the reduced liability imposed by ERISA concurrently with the mandatory insurance program of the PBGC due to take effect on that date. *See* Remarks of Sen. Javits, 126 Cong.Rec. S10099 (Daily ed., July 29, 1980). Such withdrawals would prove especially attractive to contributing employers and unions in declining industries, *i.e.*, those most affected by foreign competition, technical obsolescence and reduced demand, where the ratio of pensioners to current employees was particularly high. H.R. Rep. No. 96–869, *supra* at 51–52; 1980 U.S.Code Cong. & Ad.News at 2919–20. Unless a plan collapsed within the subsequent five years, those contributors remaining in the plan would shoulder the additional burden of the withdrawn contributors' unfunded vested benefits liabilities. 29 U.S.C. § 1364. The terms of ERISA thereby discouraged new employers from joining established plans, and actually encouraged plan termination where the shared liability upon termination would be less costly than continued payments.

To avoid the impending detrimental shift of termination liabilities to the PBGC, Congress took the interim steps of delaying the effective date of mandatory insurance to July 1, 1979, and directing the PBGC to prepare a comprehensive study of the multiemployer insurance program by July 1, 1978. Pub.L. No. 95–214, 91 Stat. 1501 (1977). The effective date of mandatory insurance was extended to May 1, 1980, and ultimately until August 1, 1980, while Congress considered the reports and recommendations of the PBGC. Pub.L. No. 96–293, 94 Stat. 610 (1980). These recommendations, submitted by letter to Congress on February 27, 1979 and introduced

in the House on May 3, 1979, form the foundation of the MPPAA.

The Congressionally-commissioned PBGC study, submitted on July 1, 1978, estimated the potential liabilities of mandatory insurance for the following ten (10) years as $4.8 billion, representing some fifteen percent (15%) of all multiemployer plans. The pre-MPPAA termination provisions of ERISA "thus threaten[ed] the survival of multiemployer plans by exacerbating the problems of financially weak plans and encouraging employer withdrawals from and terminations of plans in financial distress." H.R. Rep. No. 96–869, *supra* at 55, 1980 U.S. Code Cong. & Ad.News at 2923. Given the steady growth of multiemployer plans over the twenty-five (25) years preceding the enactment of ERISA, Congress did not foresee in 1974 the need to impose automatic rather than contingent liability upon withdrawing employers. H.R.Rep. No. 96–869, *supra* at 54, 1980 U.S.Code Cong. & Ad.News at 2922.

Yet surely the legislative power is legitimately employed for the public good to secure a valid regulatory system already in place. *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958), *reh'g denied*, 358 U.S. 937, 79 S.Ct. 310, 3 L.Ed.2d 311 (1959). A worker's pension is understood today as a form of deferred compensation and not as a mere gratuity. The underpinnings of *Railroad Retirement Bd. v. Alton R.R. Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), have thus been so altered as to obsolete its principle that protection of pensions is not a legitimate end per se. The Court concludes that the ends of the MPPAA are legitimate under the due process clause.

2. The Rationality of the Means

a) The Standard for Rationality

Both parties in this case urge adoption of the four-factor rationality analysis [5] enunci-

---

**5.** "In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interests of the parties affected; whether the impairment of the private interest is affected in an area previously subjected to regulatory control; the equities of imposing the legislative burdens; and the inclusion of statutory provi-

ated in *Nachman Corp. v. PBGC*, 592 F.2d 947, 960 (7th Cir.1979), *aff'd* on statutory grounds, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). That case held that the single-employer termination liability provisions of ERISA constitutionally superseded rights to due process created under an express clause in a collectively-bargained agreement which limited the employer's liability to the fund's actual assets. The Supreme Court affirmed *Nachman* on statutory grounds,[6] but declined to reach the constitutional issues presented.[7] Nevertheless, footnote 12 of the Supreme Court opinion quoted at length from the Seventh Circuit's analysis, specifically that portion of the opinion below which distinguished ERISA from the Minnesota statute invalidated by the Supreme Court in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). Several courts have subsequently referred to footnote 12 as a *sub silentio* affirmation of the Constitutional analysis of the Court of Appeals. *See, e.g., A–T–O, Inc. v. PBGC*, 634 F.2d 1013 (6th Cir.1980); *PBGC v. Ouimet Corp.*, 630 F.2d 4 (1st Cir.1980), *cert. denied* —— U.S. ——, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983); *Peick v. PBGC*, 539 F.Supp. 1025 (N.D.Ill.1982). Each of these cases, and virtually every court considering the constitutionality of the MPPAA since *Nachman* has utilized the four factors to evaluate the rationality of the legislated means. *See also, Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628 (4th Cir.1983); *Shelter Framing Corp. v. Carpenters Pension Trust for Southern California*, 705 F.2d 1502 (9th Cir.1983), *prob. jurisdiction noted sub nom PBGC v. R.A. Gray & Co.*, —— U.S. ——, 104 S.Ct. 271, 78 L.Ed.2d 253 (1983);

*Republic Industries, Inc. v. Central Pa. Teamsters Pension Fund*, 693 F.2d 290 (3rd Cir.1982); *I.A.M. Nat. Pension Fund, Benefit Plan C v. Schulze Tool & Die Co., Inc.*, 564 F.Supp. 1285 (N.D.Cal.1983); *The Washington Star Co. v. Int. Typographical Union Negotiated Pension Plan*, 4 E.B.C. 1145, 582 F.Supp. 301 (D.D.C.1983).

Notwithstanding its juridic currency, this Court declines to apply the *Nachman* analysis to the present case. Three of the four *Nachman* standards are distilled from Supreme Court decisions under the Contracts Clause, Art. I § 10. The Contracts Clause has never been held by the Supreme Court to be applicable to Acts of the federal government, *see e.g., Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 278 n. 31, 89 S.Ct. 518, 524, n. 31, 21 L.Ed.2d 474 (1969);[8] *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed.2d 1593 (1935); *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed.2d 1434 (1934) (contracts as properly only within the due process and "taking" clauses of the Fifth Amendment); and it was never intended to be so. *See* 2 Farrand, The Records of the Federal Convention of 1787, 619 (1911) (motion to extend the contract clause prohibitions to acts of Congress not seconded); Nowak, Rotunda, Young, Constitutional Law, 462 (2d Ed.) (contracts clause originally enacted to preclude passage of debtor relief laws by the states following the Revolutionary War). Many of the risks addressed by the Contracts Clause are reduced significantly by the breadth of the federal legislative power, and the scope of Congressional legislation. In addition, the present facts are distinguishable from those of *Nachman*, in which the issue con-

---

sions designed to limit and moderate the impact of the burdens." *Id.* Citations omitted.

**6.** The Supreme Court interpreted "nonforfeitable" rights in Title IV of ERISA to mean the same as in Title I, i.e., equivalent to "vested" rights, which would therefore have created unconditional withdrawal liability.

**7.** It is preferable to construe a statute to avoid constitutional issues rather than to resolve the

constitutional issue itself. *Lorillard v. Pons*, 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978).

**8.** While the *Thorpe* decision did evaluate the lease according to Contracts Clause standards, it did so at the suggestion of the parties, and only for the sake of argument rather than precedent. No actual impairment of the lease provisions was found.

cerned the invalidation by statute of an express contractual term. Since the MPPAA abrogates no equivalent contractual right of plaintiffs, the more stringent standards of contract clause analysis are properly eschewed in favor of a straightforward due process approach. The Court is supported in this analysis by the recent three-judge panel decision in *Peick v. PBGC*, 724 F.2d at 1263–1265 (7th Cir. 1983). Coming out of the same circuit court which decided *Nachman*, *Peick* holds authoritatively that the *Nachman* factors embody principles more relevant to the heightened scrutiny of Contracts Clause cases than to the due process analysis of *Usery v. Turner Elkhorn Mining Co.*

Moreover, this Court does not read *Usery v. Turner Elkhorn Mining Co.* as requiring consideration of "the equities of imposing the legislative burdens." *Nachman, supra,* 592 F.2d at 960. Equitable considerations under due process come into play only insofar as the underlying legislative rationale seeks to do equity. Thus, as in *Usery,* deterrence of prior conduct would not rationally justify retroactivity; neither would blameworthiness, since the Constitution prohibits "imposition of what can fairly be designated punishment for past acts," *DeVeau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960), under the *ex post facto* clause of Article I, § 10. But as a measure designed to "spread the costs of the employees' disabilities [between the employees and] ... those who have profited from the fruits of their labor," the Court in *Usery* held retroactive application of the Black Lung Benefits Act to be rational under the due process clause. 428 U.S. at 17–18, 96 S.Ct. at 2893. By quantifying equity, courts risk measuring the degree of rationality—a task clearly reserved to the legislature. *Id.,* at 18–19, 96 S.Ct. at 2894. Rather, "rationality of the means" questions only whether those legally cognizable reasons which underlie the chosen means tend to be effectuated by prospective or retroactive application of the means toward the legislated ends.

b) The Rationality of the Means Under §§ 1391, 1393

Prospectively applied, the MPPAA amended those provisions of ERISA that encouraged employer withdrawals. Whereas liability was formerly contingent under 29 U.S.C. § 1364, the MPPAA assesses liability automatically and proportionately, so that each withdrawing employer pays its individual share of the Plan's unfunded vested benefits. Since those remaining in the fund would no longer be saddled with the liabilities of those who withdrew prematurely, the MPPAA eliminated existing incentives for plan termination. By relieving potential contributors of prior liabilities, the MPPAA removed prior provisions inhibitory to plan growth.

Congress further saw fit to balance the burdens to be assumed by the plans and the withdrawing employers, where an employer withdrawal was caused by insolvency (29 U.S.C. § 1405(b)); or by a sale of assets (29 U.S.C. § 1405(a)); or where withdrawal liability was *de minimis* (29 U.S.C. § 1389); or where an employer only partially withdrew from the fund (29 U.S.C. § 1386). These new provisions encourage contribution to funds by smaller employers, and by those who seek to enter or remain in industries upon great risk of failure or speculation of success. Prospective application of the aforementioned means, among others, thus rationally promotes the ultimate goal of the MPPAA—to ensure adequate funding of employee benefits by securing the growth and stability of the multiemployer plan system—by means in which "the economic burdens of a plan in trouble are shared by workers and former workers, unions and employers alike." H.R.Rep. No. 96–869, *supra* at 63, 1980 U.S.Code Cong. & Ad.News, at 2932.

With respect to retrospective application of the MPPAA, the House Education and Labor Committee believed it essential that Congress enact by May 1, 1980 legislation to protect multiemployer plan participants against benefit losses. H.R.Rep. No. 96–869, *supra* at 62, 1980 U.S.Code Cong. & Ad.News at 2930. Public hearings on the

bill, H.R. 3904, elicited testimony from all affected parties that further delay in enactment would exact a "serious destabilizing effect" upon upcoming labor negotiations in those industries in which multiemployer plans predominate. *Id.* at 62, 1980 U.S. Code Cong. & Ad.News at 2931. Further, Congress desired to eliminate a "window period," combining limited employer liability under ERISA with mandatory insurance by the PBGC. Should major plan contributors withdraw under those circumstances, the premium cost of insurance per employee for all other plans might skyrocket from $.50 to as much as $10–20. *See, e.g.,* Remarks of Rep. Erlenborn, 26 Cong.Rec. H7903 (Daily ed., Aug. 26, 1980). Upon consideration of these factors, as well as the decline in employment, inflationary ravages, and other external economic concerns, the Committee found that neither further postponement of the May 1, 1980 effective date of mandatory insurance nor coverage of multiemployer plans under the terms of ERISA, nor repeal of benefit guarantees for multiemployer plans provided viable alternatives. H.R.Rep. 96–869, *supra* at 62–63, 1980 U.S.Code Cong. & Ad.News at 2930–32. Congress accordingly fixed the effective date of the MPPAA as April 29, 1980.

The MPPAA was thus designed to apportion the costs of the pension system among all parties. Contributors remaining in the Fund were insulated from additional liabilities. All contributors were protected from a steep upward spiraling of insurance premiums. Employees of those contributors who withdrew because of insolvency would still be covered by the PBGC, although possibly at reduced rates. 29 U.S.C. §§ 1322a, 1322b. But those who withdrew would be required to bear their own proportionate share of the liability, rather than foist additional costs upon those who continued to act in concert with ERISA's legislative aims. Had the Act permitted a "bailout" period between the date of mandatory insurance and enactment by the President, all opportunity for effective ameliorative

legislation could have vanished with the last plan out the door.

In *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Court cited ERISA as emphasizing "the importance of making only gradual and prospective changes in the rules that govern pension plans." *Id.*, at 721–22 n. 40, 98 S.Ct. at 1382 n. 40. In that case, the Court declined to afford retroactive relief under Title VII to women who had paid larger contributions to their pension fund based on actuarial findings of greater longevity as a class. Since retroactive relief posed a significant threat to the solvency and survival of the pension plan, "the rules that apply to these funds should not be applied retroactively *unless the legislature has plainly commanded that result.*" *Id.* at 721, 98 S.Ct. at 1382. (Emphasis added.) *See also United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) (bankruptcy legislation should not be applied retroactively unless the superficial statutory language manifests the unequivocal legislative intent to do so).

■ In the present context, the differences between the effective dates of ERISA and the MPPAA serve only to underscore the urgency behind the Act at issue. The due process clause was never intended to subjugate the properly-exercised powers of legislation to the individual rights of property, even where new enactments repeal existing rights. *See United States v. Darusmont*, 449 U.S. 292, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981); *Welch v. Henry*, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938); *United States v. Hudson*, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937). "Were it otherwise, the paramount powers of Congress could be nullified by 'prophetic discernment.'" *Fleming v. Rhodes*, 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 (1947). Plaintiffs bemoan the imposition of retroactive liability as a visitation of "Marley's Ghost."[9] But in light of those judi-

---

9. Plaintiffs' Memorandum of Opposition to Motion for Summary Judgment at 29. The Court,

however, would not have been so unsympathetic as to identify plaintiffs' position with that of

cial policies underlying the due process issue, the Court prefers to confront Dickens's emendatory spirit, rather than to resurrect the degenerative spectre of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). *See FHA v. The Darlington, Inc.,* 358 U.S. at 91–92, 79 S.Ct. at 146; *S & M Paving, Inc. v. Construction Laborers Pension Trust of Southern California,* 539 F.Supp. 867 at 873. Section 4201 of the MPPAA, 29 U.S.C. § 1381, is constitutional under the due process clause of the Fifth Amendment.

## B. Pre-Hearing Payment Provisions Under the Due Process Clause

The legislative history voices Congressional concern with the adverse effects of non-payment of liability upon multiemployer plans. Plans lose the benefit of investment income that may have been earned upon timely payments. Additional administrative costs are incurred by the need to ascertain, review and defend challenges to the amount of imposed liability. By requiring payments during the adjudicatory process, Congress sought to further the policy that those who remain in the fund should not bear additional burdens and losses from employer withdrawals. Remarks of Rep. Thompson, 26 Cong.Rec. H7899 (Daily ed., Aug. 26, 1980).

29 U.S.C. § 1399(c)(2) requires payment of withdrawal liability, *in toto* or by installments, within sixty (60) days of the date of demand for payment by the plan. Within ninety (90) days of demand, a withdrawing employer may request review with the plan sponsor of matters relating to liability, schedule of payments or potential inaccuracies. The employer may at such time furnish the fund with additional information in mitigation of these matters. § 1399(b)(2)(A). Arbitration of the demand may be initiated jointly by the parties within one hundred and eighty (180) days of the demand, § 1401(a)(1); or by the employer within sixty (60) days after the earlier of the date of notification by the fund of the results of the review, § 1401(a)(1)(A), or

one hundred and twenty (120) days after the initial request for review, § 1401(a)(1)(B). The statute therefore provides for review of withdrawal liability two timely mechanisms that may be instituted immediately upon receipt of the demand, and which in some cases may be afforded prior to the due date of any payments.

The Act establishes methods for computation of liability, 29 U.S.C. § 1391, and approves actuarial standards and methods by which liability is to be calculated. 29 U.S.C. § 1002(31) delineates six (6) acceptable actuarial methods and two (2) unacceptable procedures, and permits regulation of additional methods by the Secretary of the Treasury. In this case, plaintiffs' liability was computed according to the "presumptive method," 29 U.S.C. § 1391(b), which ascertains the former contributor's proportional share of the unfunded vested benefits liability of the fund, before and after the effective date of the Act.

By requiring payment pending appeal, the Act effectuates the avowed purpose of shifting the economic burdens of withdrawal back to the withdrawing employer. Concurrently, the Act allows review and appeal of the assessed liability, which in some cases may be completed before payments have been made. Installment payments, as provided under 29 U.S.C. § 1399(c)(1)(C) further mitigate the severity of that liability imposed before review. The present case differs in this respect from those Supreme Court cases concerning garnishment, sequestration and replevin statutes, not only because the liability has been assessed upon Congressionally-prescribed methods rather than conclusory allegations of fact; but also in that any deprivations of property may be gradually imposed during and after the various stages of the reviewing process. *Cf. North Georgia Finishing, Inc. v. Di Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin,* 407 U.S. 67,

the parsimonious Mr. Scrooge. *See* C. Dickens, *A Christmas Carol,* Stave One (London 1843).

92 S.Ct. 1983, 32 L.Ed.2d 556, *reh'g denied* 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). While in this case the probability of injury is sufficiently great so as to require procedures adequate to guard against the risk of initial error, *North Georgia*, 419 U.S. at 608, 95 S.Ct. at 723, those procedures mandated by the Act to ascertain and calculate withdrawal liability, and the provisions for prompt review,[10] cannot be said to be insufficient under the due process clause.

**C. Vagueness and Ambiguity in the Statutory Ascertainment of the Fact and the Amount of Liability**

█ *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), defined the basic standards for vagueness determinations. The statute must sufficiently define the regulated conduct so that a person of ordinary intelligence would be given fair warning of the covered conduct and may behave accordingly. *Id.* at 108, 92 S.Ct. at 2298–99. In the context of economic regulation, the "ordinary intelligence" standard must be read in terms of accepted business practice or usage. *United States v. National Dairy Products, Inc.*, 372 U.S. 29, 36–37, 83 S.Ct. 594, 599–600, 9 L.Ed.2d 561, *reh'g denied* 372 U.S. 961, 83 S.Ct. 1011, 10 L.Ed.2d 13 (1963); *Small Co. v. American Sugar Rfg. Co.*, 267 U.S. 233, 240–41, 45 S.Ct. 295, 297, 65 L.Ed. 589 (1925); *United States v. Cohen Grocery Co.*, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921). Second, the law must provide explicit standards so as to prevent the impermissible delegation of basic policy determinations to those charged with the law's application and enforcement, and thus preclude resolution on an ad hoc and subjective basis. *Grayned*, 408 U.S. at 108–09, 92 S.Ct. at 2298–99.

█ Generally, civil statutes merit a lesser degree of scrutiny than criminal statutes. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Economic regulation is subject as well to a lesser vagueness scrutiny; the subject matter is narrow, and there exists only a slight danger of deterring socially desirable or constitutionally-protected conduct. *Thornhill v. Alabama*, 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). Further, businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. *Flipside*, 455 U.S. at 498, 102 S.Ct. at 1193.

Plaintiffs contend the standards for determining when a withdrawal has occurred are unconstitutionally vague. Under 29 U.S.C. § 1381 a plan may impose liability upon complete withdrawal as defined by § 1383, *i.e.*, when the employer permanently ceases to have an obligation to contribute to the plan. The employer is held to have withdrawn as of the date of the cessation of the employer's obligation to contribute. 29 U.S.C. § 1383(e). Additional provisions under 29 U.S.C. § 1383(d), applicable where employers contribute to a plan in which "substantially all" of the contributions are made by employers in the trucking, moving or warehousing industries, substitute a form of contingent liability for the automatic provisions of § 1391. Plaintiffs would consider these sections unconstitutionally vague since they provide the employer with no definition sufficient to afford fair warning of the conduct concerned.

█ But vagueness challenges to statutes which do not invoke First Amendment freedoms must be examined only in light of the facts at hand. *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *United States v. Nat'l Dairy Products Corp.*, *supra*. In this case, the Fund apparently determined that the plan did not qualify under the definition of § 1383(d)(2), and thus liability was assessed against plaintiffs under §§ 1381(a), 1383(b). The facts show that either Dorn's or Oneida actually

---

**10.** The adequacy of the review process itself shall be considered by the Court, *infra* at F.

withdrew from the plan under the meaning of § 1383(a), at least as of the date when the former Dorn's employees were required to contribute only to the Teamsters fund. Plaintiffs' vagueness challenge to § 1381 must therefore fail. Where the statute clearly applies to the conduct at issue, a party has received fair warning of the consequences of its acts, and may not challenge the statute's applicability to others. *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974).

Plaintiffs' second argument concerns the "presumptive method" of ascertaining withdrawal liability under 29 U.S.C. § 1391.[11] This method, as employed by the Fund, computes by a mathematical formula the employer's proportional share of the plan's total unfunded benefits liabilities. These liabilities are calculated on the basis of a number of actuarial assumptions, *e.g.,* as to retirement age, longevity of each pensioner, and rate of return on a plan's investments. As a practical matter, no computation based on actuarial assumptions can prove to be correct. Further, since 29 U.S.C. § 1002(31) permits usage of a number of actuarial methods, the computations under each method may yield significant variations in liabilities. Plaintiffs urge the conclusion that the statutory computational methods are thereby unconstitutionally vague.

The use of actuarial computations alone creates no issue of constitutional dimension. Statutes in varied contexts employ actuarial assumptions, including 26 U.S.C. § 72 (annuities included in gross income), 31 U.S.C. § 9501, et seq. (Government Pension Plan Protection Act), 33 U.S.C. § 914(j) (computation of commuted lump sum value of benefits under the Longshoremen's and Harbor Workers' Act), and 45 U.S.C. § 231n (computation of fund solvency under the Railroad Retirement Act of 1974). On at least one occasion the Supreme Court recommended use of actuarial assumptions to determine a rate of investment return

sufficient to ascertain a widow's specific portion of an inherited trust corpus for the purposes of the marital estate tax deduction. *Northeastern Pennsylvania Nat'l Bank & Trust Co. v. United States*, 387 U.S. 213, 87 S.Ct. 1573, 18 L.Ed.2d 726 (1967). The Court cited the brief history of the widespread use of actuarial tables for income tax purposes contained in *Gelb v. Commissioner of Internal Revenue*, 298 F.2d 544, 551 n. 7 (2d Cir.1962). 387 U.S. at 224, 87 S.Ct. at 1579. Additionally, the Act and regulations promulgated thereunder, 20 C.F.R. § 901, et seq., protect the employer by prescribing acceptable methods of calculation, qualifications for enrolled actuaries, and standards of professional performance and conduct.

▪ Since a particular actuarial method will yield a uniform answer when applied to those facts available to the plan and the employer, each particular method cannot be said to be unconstitutionally vague. However, plaintiffs note correctly that different actuarial methods will produce results that are often substantially varied. Plaintiffs' vagueness challenge therefore rests on the assertion that the range of acceptable actuarial methods is unconstitutional.

But having found constitutional the use of actuarial methods generally, the Court may go no further. The judgment that plaintiffs seek requires such theoretical and empirical expertise as to fall outside the purview of the judicial prerogative. Determinations of this nature are best resolved by according significant weight to the findings and the capacities of the legislature. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. at 28, 33–34, 96 S.Ct. at 2898, 2901; *United States v. Gainey*, 380 U.S. 63, 67, 85 S.Ct. 754, 757, 13 L.Ed.2d 658 (1965). Moreover, plaintiffs have not adduced facts to this Court, either at argument or by affidavit, demonstrating the irrationality or vagueness of the actuarial method employed by the Fund's actuaries. 29 U.S.C. §§ 1381, 1383 and 1391

---

**11.** While the complaint presents no specific challenge to 29 U.S.C. § 1391 under "vagueness" standards, insofar as § 1391 is incorporated by reference in § 1381(a), it must be considered herein.

are not unconstitutionally vague, and will be upheld against plaintiffs' vagueness challenge under the due process clause of the Fifth Amendment.

### D. The "Takings" Challenge

Under this theory, Dorn's alleges that 29 U.S.C. § 1381(a) has taken without just compensation its pre-MPPAA "right" to withdraw without imposition of liability. Both Oneida and Dorn's contend that the statute takes the "benefit of their bargain" without just compensation.

■■■ The initial inquiry is whether any "property" has been taken. "Property" denotes that bundle of "rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). *Kizas v. Webster,* 707 F.2d 524, 539 (D.C.Cir.1983), acknowledges that property rights encompassed under the due process clause are not necessarily equivalent to those under the Takings clause.[12] No taking will be found where the interests asserted are not sufficiently bound up with the reasonable expectations of the claimant as would constitute "property." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). A number of cases have distinguished "property" as referring to rights in specific and identifiable interests. *See, e.g., United States v. Security Industrial Bank,* 459 U.S. 70, 75, 103 S.Ct. 407, 411, 74 L.Ed.2d 235 (1982) (secured creditor's lien interests in specific property sufficient, as opposed to interest in an unsecured debt); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. at 589, 55 S.Ct. at 863 (1935) (same). *See also Peick v. PBGC,* 724 F.2d at 1276 (7th Cir.1983); *Speckmann v. Paddock Chrysler Plymouth, Inc.,* 565 F.Supp. 469, 472–73 (E.D.Mo.1983) (MPPAA does not deprive party of a specific "property" right under the Takings clause).

■■■ Contract rights are considered "property" under the Takings clause. *Lynch v. United States,* 292 U.S. at 579, 54 S.Ct. at 843 (1934). While plaintiffs attempt to invoke these rights by referring to the taking of the "benefit of the bargain" from Dorn's and Oneida, the "benefit" they seek to protect is at best an ephemeral one. At the time the stock purchase agreement was struck between Dorn's and Oneida, the MPPAA had been in prospective effect for more than five (5) months. Some liability could have been anticipated at that time. The extent of that liability, while not assessed specifically until February 1982, could have been determined to some degree and in the exercise of reasonable diligence by consultation with the Fund.[13] The bargain between plaintiffs on March 7, 1981 was executed with constructive if not actual knowledge that Oneida was purchasing Dorn's liabilities to the Fund along with Dorn's assets. Plaintiffs thus never possessed the "benefit of their bargain" except by either fiction or ignorance.

Dorn's individual contention that the statute takes its right to withdraw without liability under ERISA also rests on the erroneous assumption that such rights constitute "property." The collective bargaining agreement between Dorn's and the Union was executed with knowledge that its right to withdraw was conditioned upon the plan's ability to survive for five (5) subsequent years. 29 U.S.C. § 1364. Had the plan terminated within that time, Dorn's would have been required to pay its proportional share of the Fund's unfunded vested benefits liability, as it is now required to do under 29 U.S.C. § 1381.

■■■ The Court cannot consider the contingent right to escape one's own liability, in derogation of statutory policies, as "property" under the Takings clause. As

---

12. The definition of "property," although a federal question, will normally obtain its content by reference to local law. *United States v. Causby,* 328 U.S. 256, 266, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946) (citations omitted).

13. Plaintiffs could have determined, for example, whether their liability might have been limited by 29 U.S.C. § 1383(d).

stated in *FHA v. The Darlington, Inc.*, 358 U.S. at 92, 79 S.Ct. at 146, a party operating in a field already subject to regulation cannot claim surprise if Congress acts to buttress its established legislative scheme. The conditional nature of the asserted "right," as well as the inherent unreasonableness of any expectation that no liability would result either by act of Congress or by termination of the plan, compel this conclusion. To decide otherwise would turn speculation into substance, and risk into rights.

■ Even assuming *arguendo* that plaintiffs possess some property interest cognizable under the Takings clause, the character of the legislation as a "public program adjusting the benefits and burdens of economic life to promote the common good" would resolve the issue on the basis that no "taking" has occurred. *Penn Central Transportation Co. v. New York City*, 438 U.S. at 124–25, 98 S.Ct. at 2659; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982); *Republic Industries, Inc. v. Teamsters Joint Council, supra*, 718 F.2d at 642.

**E. Right to Jury Trial**

■ The Seventh Amendment guarantees the right to trial before a jury in suits at common law. An exception to the guaranty is recognized for suits alleging breach of statutorily-created public rights, *i.e.*, "where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights." *Atlas Roofing Co. v. Occupational Safety Health Review Comm'n*; 430 U.S. 442, 458, 97 S.Ct. 1261, 1270, 51 L.Ed.2d 464 (1977).

■ Plaintiffs in this case reiterate a distinction argued in *Peick v. Pension Benefit Guaranty Corp.*, 539 F.Supp. at 1061, namely, that "public rights" exist only between the Government and individuals, and not between private parties. This theory has no merit. The right to jury trial has been held inapplicable "where jury trials would be incompatible with the whole concept of administrative adjudication and

would substantially interfere with ... the statutory scheme." *Curtis v. Loether*, 415 U.S. 189, 194, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974). Where Congress has entrusted enforcement of statutory rights to an administrative process, as here, the concept of expertise essential to fair administration of the statutes is inconsistent with the use of a jury as fact finder. *Id.* at 194 n. 8, 94 S.Ct. at 1008 n. 8, citing L. Jaffe, Judicial Control of Administrative Action 90 (1965). Given the role of the arbitrator as provided under the MPPAA, the Seventh Amendment right to jury trial does not attach here. *Accord, The Washington Star Co. v. International Typographical Union, supra*, at 308–09.

**F. Procedural Due Process Rights Under the Fifth Amendment**

■ Plaintiffs dispute the constitutionality of the procedures embodied in Section 4221 of the Act, 29 U.S.C. § 1401, on grounds that the presumptions of correctness afforded to the findings of the Fund's trustees and of the arbitrator, deny plaintiffs the right to a full hearing on issues of fact and law, and particularly constitutional defenses. An individual deprived of property rights cognizable under the due process clause is entitled to "some kind of hearing ... at some time" before being finally deprived of those property interests. *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). *See also Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599, 70 S.Ct. 870, 873, 94 L.Ed. 1088 (1950). The issue to be decided concerns the *nature* of the process that is due.

**1. The Procedures at Issue**

Under 29 U.S.C. § 1401(a)(1), disputes between a withdrawn contributor and a plan sponsor concerning the plan's determinations under 29 U.S.C. §§ 1381–1399 shall be resolved by arbitration. The arbitrator must presume a plan's determinations to be correct, except upon a showing by a preponderance of the evidence that the plan's findings were clearly erroneous or unreasonable. § 1401(a)(3)(A). The presumption is also afforded to the plan's determina-

tions of unfunded vested benefits for each plan year unless a party shows by a preponderance of the evidence that (i) the actuarial assumptions or methods used were in the aggregate unreasonable, or (ii) the actuary erred significantly. § 1401(a)(3)(B). Upon review by a trial court,[11] the arbitrator's findings of fact are presumed to be correct, and are rebuttable only by a clear preponderance of the evidence. § 1401(c).

2. The Procedural Due Process Analysis

▮▮▮▮ The fundamental requirement of due process is that a party shall be afforded the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Three factors must be weighed: a) The private interests affected by the official action;[15] b) the risk of erroneous deprivation of property under the mandated procedures, and the value, if any, of additional or substitute procedural safeguards; and c) the public and Governmental interests involved, including the burdens that additional procedures might entail. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

a) The Private Interests Involved

As noted, *supra*, § 1401 provides for two speedy avenues of review which may be implemented alternatively or subsequently before any liability is due under § 1399(c)(2). Of the two, arbitration encompasses the fuller spectrum of required procedural rights. While arbitration may be instituted by either party within sixty (60) days, the proceedings in many cases might not be complete prior to the due date of the initial payment. Some deprivation of property may thereby occur; but the length of any erroneous deprivation, where an employer seeks timely review, will not

be exceedingly great. *See Fusari v. Steinberg*, 419 U.S. 379, 389, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975) (length of deprivation a significant factor); *Iuteri v. Nardoza*, 560 F.Supp. 745, 751 (D.Conn.1983) (same).

Any pre-hearing deprivation which may occur is mitigated substantially by § 1399(c)(1)(C), which amortizes the withdrawn employer's liability into installment payments to be paid within a period calculable by the formula provided, but in all cases within twenty (20) years. Further, the nature of the property at issue—payments under a statute imposing automatic in lieu of contingent ERISA liability—weighs less on balance than if the liability were entirely new or unexpected. Moreover, liability under the MPPAA is triggered by the withdrawal of the plan contributor; and not by unilateral government action. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970).

b) The Risk of Erroneous Deprivation

The initial determinations of liability under the MPPAA are made by the trustees of the pension plans. Since due process demands impartiality from those in judicial or quasi-judicial capacities, *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982), citing *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242–243 and n. 2, 100 S.Ct. 1610, 1613 n. 2, 64 L.Ed.2d 182 (1980), plaintiffs contend that the MPPAA abrogates procedural due process rights by entrusting initial determinations of liability to self-interested parties.

Although a plan's trustees, as fiduciaries, act solely in the interests of the plan, *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981), Restatement (Second) of Trusts § 170(1) (1957), the role they perform in the statutory scheme is one of administration or enforcement rather than of adjudication.

---

**14.** Judicial actions to enforce, vacate or modify the arbitrator's award must be filed within thirty (30) days upon completion of the proceedings in favor of one of the parties. § 1401(b)(2).

**15.** While the Fund is a private party and not a government agency, it is performing an administrative function pursuant to statutes and regu-

lations of the federal government. The nexus between the government and the challenged action is sufficiently close as to be treated as an act of the government itself. *Jackson v. Met. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

Both the fact and the degree of liability are determined by the trustees according to statutorily mandated standards and methods which otherwise satisfy the requirements of due process. *Supra* at C. In this respect, the precision of the Congressionally-prescribed standards cures the process of the innate taint of partiality. *Schweiker v. McClure*, 456 U.S. at 197, 102 S.Ct. at 1670–71. *Cf. Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). *See also The Washington Star Co. v. Int. Typographical Workers, supra*, at 308.

However, insofar as the statute entrusts a plan with mixed questions of law and fact, *supra* at II, the plaintiffs suggest that due process requires *de novo* review of a plan's determinations by an arbitrator or a court. *De novo* review could be accomplished simply by eliminating the presumption accorded the findings of a plan under § 1401(a)(3). The result of this revision, however, would not differ substantially from the result of procedures presently provided by § 1401. Unlike the traditional arbitrator's role as mediator of disputes, arbitrators under the MPPAA are obliged to act as adjudicators. Remarks of Rep. Thompson, 126 Cong.Rec. H7899 (Daily ed., Aug. 26, 1980). Review in arbitration may thus curtail any partiality, unfairness or mistake by the plan's trustees under the "unreasonable or clearly erroneous" standard § 1401(a)(3)(A).

Further, the reasonableness of a plan's legal determinations may be weighed by the arbitrator in light of the plan's interests and expertise. Some evidence of this legislative intent may be gathered from the language of § 1401(a)(3), which grants generally a presumption of correctness to all of the plan's findings, but specifically reinforces the presumption only with respect to the computations and actuarial assumptions employed. *Compare* § 1401(a)(3)(A) *with* § 1401(a)(3)(B).

The nature of the proceeding also diminishes the need for a prompt pre-deprivation hearing under the Act. Unlike those cases concerning eligibility for government benefits or entitlements, issues under the MPPAA center upon the correctness of methods and conclusions of the plan rather than upon the credibility of witnesses, or of the factfinders themselves. *Cf. Mathews v. Eldridge*, 424 U.S. at 343–344, 96 S.Ct. at 907; *Goldberg v. Kelly*, 397 U.S. at 269, 90 S.Ct. at 102 (full pre-deprivation hearing is appropriate where credibility of the witnesses is at issue). Although in specific cases the credibility of the trustees may be placed at issue, procedural due process rules are shaped by the risk of error in the generality of cases and not the exceptions. *Mathews v. Eldridge*, 424 U.S. at 344, 96 S.Ct. at 907.

With respect to the inherent procedural adequacy of arbitration, "it is too late in the day to argue that compulsory arbitration, per se, denies due process of law." *Republic Industries, Inc. v. Teamsters Joint Council, supra*, 718 F.2d at 640, and cases cited therein.

All the aforementioned arguments apply with equal measure to the value and utility of *de novo* review by a court of law of determinations by a plan or an arbitrator. The judiciary lends its legal expertise to review of the findings below, while only factual determinations are granted the presumption under § 1401(c). Thus, a withdrawn contributor bearing a legitimate challenge to the constitutionality of the Act preserves fully the right to mount an "as applied" legal attack while developing the necessary factual record in arbitration below.[16] Considering the available safeguards under the Act, and the nature of the determinations reviewed, the additional procedures requested by plaintiffs would not alter significantly the results of the present process of review. In such cases, "where the potential length or severity of the deprivation does not indicate a serious loss and where the procedures underlying the decision to act are sufficiently reliable

---

**16.** In this regard, plaintiffs are not literally precluded from raising "as applied" constitutional defenses before an arbitrator under § 1401. Such claims may be thought to "concern" a determination made under §§ 1381–1399. However, generally, constitutional issues will be presented before a court of appropriate jurisdiction.

to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards,'" *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978) (citations omitted).

c) The Public and Governmental Interests

■ Finally, the interests of the Government and the pensioners reinforce the effectiveness of and the purpose behind the chosen procedures. Complex technical determinations of the amount of liability are allocated to those with the greatest expertise. Plans are protected under the Act from inconsistent judicial or arbitrator holdings by a range of acceptable actuarial methods, and a concrete formula by which liability may be calculated. Lengthy, futile and costly bickering over the adequacy of the methods chosen is precluded by the statutory provisions of §§ 1002(31), 1391 and the presumptions of § 1401. The Act thus rejects compromise as antithetical to the paramount interests of the pensioners and the PBGC. While additional procedural safeguards might contribute to the perception of the withdrawn contributors that justice had been equitably served, the extensive cost to the taxpayer and to the funds far outweighs the benefit to be gained. *See Parham v. J.R.*, 442 U.S. 584, 605 and n. 14, 99 S.Ct. 2493, 2506 n. 14, 61 L.Ed.2d 101 (1979). In recognition of the strong presumption favoring the validity of congressional actions and of "congressional solicitude for fair procedure . . . ," *Califano v. Yamasaki*, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1973), the Court concludes that section 4221 of the Act, 29 U.S.C. § 1401, is a just and rational construct that satisfies the procedural requirements of the due process clause.

IV. Conclusion

The legislative power, most aptly employed, must be capable of remedying infirmities in prior legislation as may be warranted in light of experience and changing economic conditions. To accept the contentions of plaintiff would require the exercise of judicial power in defiance of those economic and social policies clearly within the province and discernment of Congress. This Court cannot stretch the language of the Constitution to such extremes. The climate and the assumptions which produced such decisions as *Railroad Retirement Bd. v. Alton R.R. Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), will no longer invalidate urgent and necessary ameliorative pension reforms. The Court thus concurs with the majority of the circuits in affirming the constitutionality of the MPPAA.

ORDER

Wherefore, it is hereby ORDERED that Defendant's Motion for Summary Judgment shall be and is hereby GRANTED; and it is

FURTHER ORDERED that the complaint be and hereby is dismissed with prejudice and judgment entered for the defendant.